IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARILYN C., | ) | |
| | ) | |
| Plaintiff, | ) | No. 22 C 5096 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, about six years ago in May 2017. [20-cv-1816; Dkt. #17-2, at 161]. She claimed that she had been disabled since August 26, 2016, due to "detached retina, retina surgery, dizziness, vision impairment." [20-cv-1816; Dkt. #17-2, at 195]. Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. [20-cv-1816; Dkt. #17-1, at 3-8, 13-27, 62-84]. She appealed to the federal district court on March 16, 2020, and on February 9, 2023, Magistrate Judge Heather McShain, in a thorough and well-reasoned opinion, affirmed the ALJ's decision that plaintiff did not have a severe impairment at any time through December 13, 2018.

On January 21, 2020, about a month after the Appeals Council denied plaintiff's first application, and about two months before she filed suit for review of her first application, she filed another application. (R. 496). This time she claimed she had been disabled since December 2018 due to "Major Depression, Macular Pucker in left eye, Osteoarthritis in multiple joints, Fibromyalgia

Spastic Pelvic Floor Syndrome, Anxiety, Chronic Hemorid[sic], Constipation." (R. 384). The application was denied initially on November 18, 2020 (R. 399), upon reconsideration on March 2, 2021 (R. 418), and by an ALJ after an administrative hearing on November 26, 2021. (R. 306-22). The Appeals Council denied the plaintiff's request for review of the ALJ's decision on July 19, 2022 (R. 1-7), and the plaintiff filed another lawsuit on September 19, 2022. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on September 23, 2022, and the Executive Committee reassigned the case to me. [Dkt. ##8, 9]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: detached retina of left eye; status post left cataract surgery; arthritis; myofascial pain syndrome and mild degenerative disc disease of the cervical spine. (R. 312). The ALJ said the plaintiff's other impairments caused no more than mild limitations and was, therefore, nonsevere. (R. 312-13). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on Listings 1.15, 1.16, 1.18, 2.02, 14.09. (R. 313-14).

Next, the ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional restrictions:

> never climb ladders, ropes, or scaffolds; can avoid ordinary hazards in the workplace but cannot have more than occasional use of depth perception; and never work at unprotected heights, around moving mechanical parts or operate a motor vehicle.

(R. 314). The ALJ went on to summarize the plaintiff's complaints: the plaintiff testified that she had vision issues, and was unable to drive or thread a needle. She alleged pain and burning sensations in her toes and feet, as well as a burning sensation in her tongue. Plaintiff also claimed that has lower back pain, that her neck hurts, that she cannot lift her arms, and she gets dizzy. She also said she needs assistance with chores. The ALJ found that while the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 314).

As for the medical evidence, the ALJ noted that the plaintiff had a history of left retinal detachment and cataracts in her left eye, and was seeing an ophthalmologist. In April 2018, pinhole corrected vision in both eyes was 20/80, visual fields were full, and she was noted to have "dramatically improved." A year later, her pinhole corrected vision was 20/60. In March 2020, she was noted to have a very healthy optic nerve. At her consultative exam, plaintiff said her vision in her right eye could be blurry and curvy, but Snellen was 20/50 in the right and 20/20 in the left. (R.315).

With respect to plaintiff's neuropathic symptoms and pain, the ALJ related that plaintiff's December 2019 EMG was normal. She was treated with Gabapentin. Neurological exam in October 2019 was normal. In December 2019, plaintiff's neurologist noted that cranial nerves were normal, she had 5/5 strength, normal sensation to pinprick, light touch and vibration, proprioception was intact, coordination was normal, deep tendon reflexes were normal and gait was narrow-based and steady with appropriate stride length and arm swing. Plaintiff was treated conservatively with

Gabapentin, and exercise was recommended. To that end, the plaintiff said she did 40 minutes of yoga a day. At her consultative exam in October 2020, upper extremities were entirely normal. There was no swelling, tenderness, deformity or increased warmth in any joints. Range of motion, grip strength, and grasping and manipulation were all normal. Lower extremity exam was limited because as the plaintiff was getting over an ankle fracture and was in an orthopedic boot. Neurological exam was normal, although touch sensation was increased in the lower leg. Neurological examination in March 2021 was normal with 5/5 strength, normal sensation and normal gait. The plaintiff had some difficulty with tandem gait but was able to perform heel/toe. (R. 315). In August 2019, x-rays of the cervical spine showed mild degenerative changes, disc space narrowing at C5-6 and C6-7 with marginal osteophytosis at C4 through C7. Range of motion was normal. X-rays of the lumbar spine were unremarkable, showing some degenerative changes but no osseous abnormality. EMG was normal with no evidence of a mononeuropathy, radiculopathy, plexopathy, polyneuropathy, or myopathy. (R. 316, 847-48).

      The ALJ moved on to the medical opinions. He noted that the state agency consultants felt that the plaintiff's impairments were all nonsevere. The ALJ found these opinions partially persuasive, explaining that plaintiff had minimal mental health treatment and minimal deficits on mental status exams. But, the ALJ found plaintiff's physical impairments to be severe given her consistent complaints and history of visual issues. The ALJ found the psychological consultative examiner's opinion that plaintiff was limited to simple, routine tasks; would have difficulty handling mild to moderate work pressure; and might not retain instructions from day to day not persuasive. The ALJ explained that it was wholly unsupported by the remainder of the file because plaintiff's mental status exams are essentially normal or show minimal deficits, with normal memory,

4

concentration and cognitive functioning. The ALJ also rejected the physical consultative examiner's opinion that plaintiff had a moderate limitation with respect to walking, sitting, standing, lifting, or carrying, because it was unsupported by the exam findings, which were all normal. (R. 316).

Finally, the ALJ, relying on the testimony of the vocational expert, found that plaintiff retained the capacity to perform her past sedentary to light work as an AVP/Account Executive, a Director of Learner Engagement, an Executive Assistant, or an Underwriting Assistant. Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 316-17).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Crowell v. Kijakazi*, _F.4th_, 2023 WL 4377086, at *1 (7th Cir. 2023), *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Bakke*, 62 F.4th at 1066. To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the

5

weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to allow the court to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us

as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[1] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2] The ALJ has done enough here.

---

[1] A perfect example is the aforementioned *Jarnutowski.* There, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning, 748 F.4th at 774-77, while a third judge, dissenting, thought she did. 748 F.4th at 77-79. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[2] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

(continued...)

### III.

The plaintiff has three main arguments for why she believes the ALJ's decision should be overturned. First, she complains that the ALJ's physical RFC is not supported by "substantial evidence," and the ALJ created an evidentiary gap in the record. Next, she contends that the ALJ erred in evaluating plaintiff's mental impairments. And, finally she says that even if the ALJ was right to find mild mental impairments, she failed to properly incorporate them into her RFC. Each of these arguments has some sub-components,[3] which makes the plaintiff's brief a bit of what the Commissioner calls a "kitchen-sink" affair. That can make review a bit more difficult and, as litigation strategies go, it's not the best. *See United States v. Friedman*, 971 F.3d 700, 710 (7th Cir. 2020)("[A] brief that treats more than three or four matters runs a serious risk of becoming too

---

[2](...continued)
We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

[3] It is unlikely that the plaintiff has left anything out of her brief, but any other arguments plaintiff might have raised are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020).

diffused and giving the overall impression that no one claimed error can be very serious."); *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011)(brief that presents a dozen claims of error "effectively ignor[es] our advice that the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis."). Be that as it may, after a review of the record and the ALJ's decision – with plaintiff's many contentions in mind – it must be concluded that the ALJ's decision must be affirmed as supported by substantial evidence.

**A.**

First, the plaintiff complains that the ALJ failed to explain why fibromyalgia was not established under SSR 12-2p. [Dkt. #14, at 6]. The plaintiff has a point, because all the ALJ said about it was:

> The record lists fibromyalgia as a diagnosis, but per SSR 12-2p, it has not been established. In Exhibit B12, it indicates she is managed by rheumatology, but there is no regular treatment with a rheumatologist. In January 2020, she had diffuse pain more than tender points, per one rheumatologist. She was told to exercise more and that her MRI findings are not related to symptoms (B12F/56). Further, her symptoms are neuropathic.

(R. 312). That's a far cry from the analysis required by SSR 12-2p, which somewhat confusingly provides two sets of criteria for ALJs to go through, one older and one newer. Comparing those sets of criteria to the ALJ's discussion, it doesn't appear that he went through either set. There is nothing in either set about "regular treatment with a rheumatologist." *Compare Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016)(". . . doctors' lack of specialization in rheumatology is not an acceptable basis for discounting their assessments."). While the older set requires "tender points", the newer set does not. Neither set mentions MRI findings; indeed, why would they, as fibromyalgia cannot be assessed by objective tests. *Gebauer v. Saul*, 801 F. App'x 404, 409 (7th Cir. 2020); *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). And, finally, we have no idea wht the ALJ meant

9

by "[f]urther, her symptoms are neuropathic." Compare https://consultqd.clevelandclinic.org/why-fibromyal.gia-is-neuropathic/; https://pubmed.ncbi.nlm.nih.gov/30212264/ ("More recent studies however found newer evidences of pathophysiology including small fiber neuropathy in patients with fibromyalgia."). As "logical bridges" go, the ALJ's explanation is barely a tightrope.

But, as the Commissioner points out, the ALJ's failure is harmless if he went on to consider all of plaintiff's severe and non-severe impairments and properly fashioned a residual functional capacity finding based on substantial evidence, in her RFC. *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019)("Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless. . . . Either way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe."); *Curvin v. Colvin*, 778 F.3d 645, 649–50 (7th Cir. 2015)(" . . . even if there were such an error at step 2, it would have been harmless because the ALJ properly considered all of [plaintiff's] severe and non-severe impairments, the objective medical evidence, her symptoms, and her credibility when determining her RFC immediately after step 3. So, even if there were a mistake at Step 2, it does not matter."); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment. . . . the ALJ categorized two impairments as severe, and so any error of omission was harmless."). As the ALJ said following his less than edifying SSR12-2p discussion, "[r]egardless, even if her condition is fibromyalgia or myofascial pain, the light level accommodates it." (R. 312).

Still, as the plaintiff points out, that RFC finding still has to pass muster; the plaintiff doesn't think it does. In other words, she doesn't think the ALJ made an adequate case that she is able to

10

perform her past sedentary to light work. Important in this context is the fact that the *plaintiff* has the burden of proving she is unable to return to her past relevant work. *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022); *Skinner v. Astrue*, 478 F.3d 836, 844 n.1 (7th Cir. 2007). She has to do so by providing medical evidence. *See Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). Her complaints and allegations are not enough. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)("Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."); *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) ("A claimant's assertions of pain, taken alone, are not conclusive of a disability."). Plaintiff cites several records from examinations but, in the main, they detail normal findings. [Dkt. #14, at 3-4]:

> July 29, 2019 – Plaintiff's doctor states her "pain is neuropathic - with character of small fiber neuropathy; no evidence of polymyalgia - may be a component of myofascial pain; will treat with gabapentin and cyclobenzaprine." (R. 864).
>
> August 13, 2019 – Plaintiff complained of chronic diffuse pain and altered sensation in all limbs, worse in the right hand and left leg, but strength and sensation were normal upon examination. Nerve conduction study was normal. (R. 861).
>
> August 22, 2019 – Plaintiff complained of chronic diffuse pains and paresthesias, which the doctor felt were most consistent with myofascial pain, although he said small fiber polyneuropathy could "not be ruled out based on the quality of her symptoms and distribution. Neurologic exam was intact with no focal deficits." The doctor stopped flexeril and resumed 100 mg gabapentin TID. (R. 859).
>
> September 13, 2019 – Plaintiff complained of tingling/burning in feet and hands, and lower left leg, as well as dizziness, dropping objects, and being unable to hold a pen for long. (R. 853). Upon examination, her gait was normal; lumbar spine movement caused burning in hands and feet; her and strength normal except for quadriceps. (R. 854). Physical therapy was deemed medically necessary. (R. 855).
>
> September 13, 2019 – Plaintiff complained of diffuse myofascial pain/paresthesia, the etiology of which was unclear as an EMG was normal. (R. 851). There was

11

diffuse pain rather than tender points upon musculoskeletal exam. (R. 852).

October 17, 2019 – Plaintiff complained of joint stiffness, arthralgia, dizziness, and headaches, but neurological exam – cognition, sensation, strength – was, again, completely normal. (R. 846-47).

December 4, 2019 – Plaintiff complained of burning, numb pain, rating it 7/10 in severity, in the feet and hands. Her normal EMG was noted. (R. 841). Motor strength was 5 out of 5 in all extremities bilaterally; sensory examination was normal to pin prick, light touch, and vibration throughout; coordination exam was normal; reflexes were normal; gait was narrow based and steady with appropriate stride length and arm swing. (R. 843). The doctor's impression was that she may or may not have some degree of underlying small fiber neuropathy or "a chronic pain disorder, akin to fibromyalgia or similar" (R. 845).

January 3, 2020 – Plaintiff complained of "diffuse myofascial pain", headache, and gait problems. (R. 839). There was no peripheral edema, no synovitis; again, she had diffuse pain more than tender points. (R. 841).

January 14, 2020 – Plaintiff had no neurological or musculoskeletal complaints. Exam reveal no focal deficits. She could move all 4 extremities spontaneously, and ambulate from chair to the exam table without difficulty. (R. 838).

March 20, 2020 – Plaintiff again had no neurological or musculoskeletal complaints. (R. 835). She exhibited no redness, warmth, or swelling of the joints. Full range of motion was noted. Motor strength was 5 out of 5 all extremities bilaterally. Her muscle tone was normal. (R. 836).

None of that proves she has fibromyalgia, but that's neither here nor there. A diagnosis is not disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). What matters is the severity of the condition and how it limits plaintiff's capacity to work based on clinical and/or laboratory findings. *See Elder*, 529 F.3d at 415 ("... it makes no difference if [plaintiff] saw [his doctor] "every two-and-a-half months" ... what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests."); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity...."), and

12

fibromyalgia – pain and all – is not necessarily disabling. *Apke v. Saul*, 817 F. App'x 252, 258 (7th Cir. 2020); *Gebauer*, 801 F. App'x at 410; *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019). The problem for plaintiff is that none of the evidence she relies upon – generally normal exam results and no notations of any limitations – proves she is incapable of performing her past work as an AVP/Account Executive, a Director of Learner Engagement, an Executive Assistant, or an Underwriting Assistant.

The best that plaintiff can do is reference to the consultative exam she underwent in October of 2020. But, as with the other records plaintiff relies upon, there's not much there but normal findings. The doctor noted that the plaintiff could get on and off the exam table with no difficulty and could get up from the sitting position with no difficulty. Unlike plaintiff's treating doctors, he noted 12 positive fibromyalgia tender spots. But, at the same time, he noted there was no tenderness in plaintiff's cervical spine or lumbar spine. Plaintiff's range of motion throughout her spine was normal. Straight leg raise testing was negative bilaterally in the sitting and supine position. There was also no tenderness or limitation of motion in her upper extremities. She had full grip strength and manipulative ability in both hands. At the time of the exam, plaintiff was recovering from a broken ankle, so she was walking with a limp and unable to squat or hop. Range of motion in the other joints of her legs was normal. Neurological exam was normal. Sensory perception to pin prick and touch sensation was increased in the lower leg. (R. 982-87). So, aside from the healing ankle, the consulting doctor noted no limitations. But, in the end, he stated that given her "above-stated problems, [plaintiff] is expected to have moderate limitation with respect to walking, sitting, standing, lifting, or carrying but not handling of objects." (R. 987). Plaintiff hangs her hat on that last statement, arguing that a moderate limitation in sitting and standing means she can't handle light

13

work. [Dkt. #14, at 7].

The ALJ rejected the consulting doctor's opinion for two reasons. (R. 316). First, the ALJ noted that the doctor's opinion was inconsistent with his own essentially normal exam findings. Indeed, where the moderate limitations came from is difficult to see. The persuasiveness of a medical opinion is tied to both its consistency with the medical record as a whole and support from the doctor's own findings. *Bakke*, 62 F.4th at 1068; *Albert*, 34 F.4th at 614. The consulting doctor's opinion was deficient in both respects. The ALJ was well within his rights to reject it.

The ALJ also criticized the consulting doctor for not couching his findings in functionally relevant terms. And, indeed, "moderate' limitations is vague. It's unclear why a doctor performing consultative exams for the Social Security Administration would fail to use the *lingua franca* of disability cases. But, the main problem remains the gulf between the doctor's examination findings and his opinion.

Overall, the tenor of plaintiff's brief seems to be that her allegations are more than enough to carry the day. She argues that she:

> reported issues with sitting and standing. (R. 554, 582). She reported problems getting comfortable. (R. 564). She reported numbness and pins and needles to her hands and feet. (R. 582, 589, 591). [She] testified to issues with her hands due to the FMS (R. 352-53) and pain resulting from her FMS. (R. 345). None of this evidence supports the ALJ's "light work" finding.

[Dkt. #14, at 10]. But, as already detailed, her "reported issues" are not enough. She has the burden to prove she cannot return to her various desk jobs with *medical* evidence and none of the *medical* evidence proves that she cannot perform her past work. She failed to carry that burden here.

So, in the end, plaintiff may or may not have fibromyalgia, but the record fails to depict any limitations stemming from whatever she has that would prevent her from returning to her past work.

14

Yes, the plaintiff complains of pain and yes, the plaintiff has been prescribed Gabapentin. But being unable to work without pain does not entitle someone to disability benefits. *See, e.g., Castile*, 617 F.3d at 929 (affirming ALJ's decision noting that "[d]isability requires more than mere inability to work without pain."); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989)("Even if [plaintiff] did experience some discomfort, this alone does not establish disability."); *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir. 1986) ("disability requires more than mere inability to work without pain"). People working without pain or discomfort, especially after age 50, are few and far between, even in office jobs. If pain while working was all it took to qualify for disability benefits, "eligibility for disability benefits would take on new meaning." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2nd Cir. 1983).

**B.**

The plaintiff takes a similar tack with her mental impairments, focusing on her reports and diagnoses. [Dkt. #14, at 11-12]. As with her physical impairments, the medical records pertaining to her psychological impairments depict generally unremarkable findings:

> November 18, 2020– The plaintiff reported anxiety and depression. (R. 1217). Examination revealed mental status to be within normal limits and behavior to be normal. (R. 1218).
>
> December 2, 2020– The plaintiff reported anxiety and depression. (R. 1211). Again, upon examination, mental status was within normal limits and her behavior was normal. (R. 1212).
>
> December 9, 2020– The plaintiff reported anxiety and depression. (R. 1205). Yet again, her mental status was observed to be within normal limits and her behavior was normal. (R. 1206).
>
> August 14, 2020 – The plaintiff complained of depression and anxiety. She reported that she drank a bottle of wine on the weekends and took marijuana edibles. (R. 914). Examination showed her mood to be down and her affect full and congruent. Her thought processes were observed to be logical and linear; thought association

15

>was intact; concentration was normal; memory was normal; insight and judgment were fair. (R. 918).
>
>August 22, 2019 – Plaintiff reported depression and anxiety but declined medication saying she had difficulties when she ceasing medication the last time. She said she drank a few glasses of wine on the weekends and took marijuana gummies when she traveled to California (R. 856-57).
>
>April 9, 2021– Diagnosis was generalized anxiety disorder, major depressive disorder, recurrent, moderate. (R. 1514). Once again, upon examination, mental status was within normal limits and behavior was normal. (R. 1515)
>
>July 25, 2021 – Plaintiff reported worsening neuropathic pain in her wrists, hands, and feet, since 2016. She was taking Cymbalta and doing yoga every day. (R. 1445).

So, throughout the records the plaintiff relies upon, the watchwords are "normal" or, at worst, "fair." There may be mentions here and there in the record of "severe" depression but, at the same time, plaintiff's own citations to the record show that there is *at least* substantial evidence that plaintiff mental status was normal or fair.

And, again, diagnosis alone does not carry the day. The question is not whether plaintiff has been diagnosed with depression; the question is whether the plaintiff's depression prevents her from returning to her past work. As the ALJ noted, exams showed "normal memory", "normal concentration", no "interpersonal deficits", or "normal memory, concentration and cognitive functioning." (R. 313, 316). "Normal" or "fair" findings do not suggest an inability to work. *See, e.g., Sebranek v. Kijakazi*, No. 20-3399, 2022 WL 520786, at *4 (7th Cir. Feb. 22, 2022)(upholding ALJ's finding of no severe mental impairment where there were no more than mild or moderate symptoms documented in exams); *Burmester*, 920 F.3d at 511 (no disability where records consisted of "mostly normal findings" and there was no finding of an inability to concentrate on work).

As with plaintiff's fibromyalgia, there simply isn't any medical evidence to indicate her symptoms are so bad that she can't work; in any event, she doesn't point to any in her brief. Instead, plaintiff invites us to do a bit of nit-picking of the ALJ's decision, which a reviewing court cannot do. *Gedatus*, 994 F.3d at 901; *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Castile*, 617 F.3d at 929.

Moving on, the plaintiff claims at one point that:

> the ALJ found Clancy had mild limitations in concentration, persistence or pace. He judged this based on her capacity to watch the news or play games on her telephone.

[Dkt. #14, at 14]. Yes, the ALJ did reference the plaintiff's activities, as he is required to do. *Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020). The plaintiff seems to ignore the ALJ's repeated references to medical evidence which, as the ALJ pointed out, consisted overwhelmingly of normal mental status examinations findings. (R.313, 316). Obviously, the less the plaintiff says about all the normal exam findings in the record, the better for the plaintiff, but they do constitute substantial evidence to support the ALJ's decision. The court has to read the ALJ's decision as a whole without editing out the evidence that's bad for the plaintiff. *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022); *Zellweger v. Saul*, 984 F.3d 1251, 1254–55 (7th Cir. 2021) (reversing district court for failing to read ALJ's decision "holistically"). And with that reading, the ALJ's decision must be affirmed.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. # 19] is granted and the ALJ's decision denying benefits is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7-14-23